(133 So. 756)

JACOBS et al. v. COLUMBIA COMPRESS & WAREHOUSE CO.

No. 30110.

March 2, 1931.

Rehearing Denied March 30, 1931.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellant.

Dimick & Hamilton, of Shreveport, for appellees.

O'NIELL, C. J.

This is a petitory action, contesting the title to four lots, numbered 47, 48, 49 and 50, on an official map of the city of Shreveport. The four lots form a triangle in the intersection of Commerce street and what was once Upper Water street. The triangle was divided into the four lots by lines drawn from Commerce street, and perpendicular thereto, to Upper Water street; lot 47 being the smaller triangle in the intersection of the two streets. Upper Water street has been closed and abandoned by authority of a city ordinance. Half of the abandoned street, where it adjoined the four lots, is therefore also in contest. The question is whether the four lots in dispute are a part of block 65. The defendant holds title to block 65 from John R. Jones, who died many years ago. The plaintiffs are the widow and heirs of W. B. Jacobs, who died on the 3d of March, 1904, and who held a deed for lots 47, 48, 49 and 50 from John R. Jones, subsequent in date to the defendant's deed for block 65. The district judge decided that lots 47, 48, 49 and 50 were not a part of block 65. He held that the suit of the widow of Jacobs was barred by the prescription of thirty years, but that the prescription was suspended during the minority of the heirs of Jacobs. Hence the judge gave judgment in favor of the heirs of Jacobs for a half interest in the property in dispute, and rejected the widow's demand. The defendant has appealed; and the widow, answering the appeal, prays for a reversal of the judgment in so far as it is against her.

In the sense that a city block is an area bounded by streets and not intersected by a streets, lots 47, 48, 49 and 50 do form a part of block 65, because the area which bears the block number 65, and which has no other block number on it, is a right-angle triangle having its point in the intersection of Commerce street and Upper Water street, and extending to Caddo street. This triangle, including lots 47, 48, 49 and 50, measures 320 feet on Commerce street, 135 feet on Caddo street, and 347 feet and 4 inches on its hypotenuse, on Upper Water street; that is, according to the scale of the official map of that part of the city of Shreveport. The whole triangle, therefore, has exactly the same measurement on Commerce street that each and every city block south of Commerce street has on each of its four sides; and the point of the triangle extends exactly to Fannin street, which crosses Commerce street at right angles, at the point where Upper Water street intersected Commerce street. Block 65, therefore, if it embraces the lots in dispute, is in line with all of the blocks on the other side of Commerce street; otherwise it is not.

The plaintiffs contend that block 65 is only that part of the triangle lying between lot 50 and Caddo street; and that lots 47, 48, 49 and 50, notwithstanding they form a part of the large triangle marked block 65, are not a part of block 65, but are a part of what is called the batture of Shreveport.

John R. Jones owned all of what the defendant contends is block 65, including lots 47, 48, 49 and 50, and owned also a larger area,

designated as lots 29 to 46, inclusive, on the other side of Upper Water street, opposite the larger triangle which the defendant contends is block 65, and extending from Caddo street to Fannin street.

On the 28th of February, 1889, Jones mortgaged to the Shreveport Fire Insurance Company, to secure a promissory note for $8,800, "Block Sixty-five (65) and Block Sixty-six (66) of the City of Shreveport, La., together with all the buildings, machinery and improvements thereon." And, on the 17th of June, 1901, Jones mortgaged to the Merchants' & Farmers' Bank, of Shreveport, to secure a promissory note for $15,000, block 65 and 66 and the land described as lots 29 to 46, inclusive, on the other side of Upper Water street, and also lots 51 and 52, on the opposite corner of Commerce street and Fannin street. It is significant that Jones did not include, specifically, in the description of the lands which he mortgaged to the bank, lots 47, 48, 49 and 50, but skipped from lot 46 to lot 51; the inference being that it was understood that lots 47, 48, 49 and 50 were included as a part of block 65. The bank, therefore, had a second mortgage on blocks 65 and 66, behind the insurance company's mortgage for $8,800, and had the first mortgage on all of the other property described in the bank's mortgage. The bank afterwards took up the mortgage note of the insurance company, and, on the 22d of April, 1897, brought executory proceedings on both mortgages, and bought in all of the mortgaged property at the sheriff's sale, on the 5th of June, 1897. The sheriff made separate sales to the bank, one sale being of "Block 65 and Block 66 of the City of Shreveport, Louisiana, with the buildings and improvements thereon," and another sale being of lots 29 to 46, inclusive.

On the same day, the 5th of June, 1897, the bank sold the whole area, described as blocks 65 and 66 and lots 29 to 46, inclusive, to the defendant, Columbia Compress & Warehouse Company. The company went into possession immediately, demolished the old buildings, and commenced constructing the new compress and warehouse buildings, consisting of large brick structures, erected mainly upon the land in contest in this suit. The buildings were completed before the end of the year 1897; and the land has been occupied thus ever since; that is to say, for more than thirty-one years before the filing of this suit.

In July, 1897, W. B. Jacobs, having a judgment against John R. Jones for $1,813, dated the 5th of December, 1891, obtained a writ of fieri facias, under which the sheriff seized, as the property of Jones, lots 47, 48, 49 and 50 of the batture of Shreveport. That was while the defendant was in possession of the land, constructing the compress and warehouse upon it. The lots were sold by the sheriff and bid in by Jacobs, on the 24th of August, 1897, for $667, which, according to a recital in the sheriff's deed, Jacobs retained as a credit on his judgment against Jones.

Jacobs, who was a prominent and wealthy business man in Shreveport, continued residing there until his death, the 3d of March, 1904, and, during that period of nearly seven years after buying the lots at the sheriff's sale, made no claim to the property, nor protest against the defendant's having its compress and warehouse upon the property. On the contrary, Jacobs had his judgment against Jones reinscribed in the mortgage records on the 29th of November, 1901, without giving Jones credit for any part of the $667, as the price for which Jacobs had bid in the four lots; and thus he reserved his judicial mortgage against Jones for the full amount of $1,813, with interest at 8 per cent. from the 13th of June, 1891. But, more important yet is the fact that, on the 30th

of November, 1901, Jacobs obtained a judgment against Jones, "by reason of the law and the evidence and the written consent of the defendant, Jones," maintaining for another ten years the judgment against Jones for the full amount thereof, without any allowance for the $667 for which Jacobs had bought the four lots at the sheriff's sale, four years before. It is apparent, therefore, that Jacobs did not pay any price or allow any credit for the four lots now in contest; and it is equally certain that Jones, by his judicial and written consent that the judgment should remain in force for its original amount with accruing interest, recognized that Jacobs had not obtained a title to lots 47, 48, 49 and 50 by the sheriff's sale.

The widow and all except one of the heirs of Jacobs have resided in Shreveport ever since his death, except that the two sons served in the late war. It is significant that none of them ever contended that lots 47, 48, 49 and 50 were not a part of block 65, until one of the attorneys for the defendant, in March, 1925, requested them to give the defendant a quitclaim, for a nominal consideration, in order to remove the cloud upon the title to the four lots. The letter, making the request, was referred by the plaintiffs to their attorneys; and the result was this lawsuit.

The deed by which Jacobs bought the four lots at the sheriff's sale, on the 24th of August, 1897, was not recorded until the 8th of June, 1900. The assessor then assessed the four lots in the name of W. B. Jacobs, and he paid the taxes so assessed for 1901, 1902 and 1903. Thereafter the lots were assessed in the name of estate of W. B. Jacobs, and the estate paid the taxes so assessed regularly until and including the taxes for 1918. In that year the four lots were omitted from the list of property assessed in the name of estate

of W. B. Jacobs. The estate of W. B. Jacobs, or the plaintiffs in this suit, therefore, did not pay taxes on the property in contest during the ten years preceding the filing of this suit. The defendant, on the other hand, has paid the taxes regularly on blocks 65 and 66 since 1897; that is, for thirty years before this suit was filed. During the first twenty of the thirty years the list of property assessed to the defendant included also lots 29 to 48, inclusive; during the last ten years the list has included lots 29 to 50, inclusive; and during the last seven years it has included also "an abandoned street and alley"—meaning, of course, Upper Water street, which was only one block in length, and an alley which separated lots 29 to 36, inclusive, from lots 37 to 46, inclusive. The closing of this short street and alley made one continuous area of lots 29 to 46, inclusive, and blocks 65 and 66, all of which area was possessed by the compress company, as owner.

The evidence on which the plaintiffs rely to support their contention that lots 47, 48, 49 and 50 are not a part of block 65 is the testimony of the city engineer of Shreveport, who testified, with reference to a blueprint which had been made from a so-called tracing which some other engineer had made of the original official map of Shreveport, that these lots were not originally a part of block 65. The original map was placed on record, by being placed in the book in the recorder's office, in December, 1857, and it became so mutilated from use that the clerk of court recently placed it in a frame and under a glass cover to preserve it. A photostat of the original map is in the record, as evidence for the defendant, and shows that the map became torn apart and was pasted together, and that two seams cross each other in block 65 and almost obliterate that part of block 65 which is now in contest. It appears, there-

fore, that the so-called tracing, from which the witness made the blueprint, was more of a reconstruction than a tracing of the lines of block 65; and it is not unlikely that block 65 appeared on the original map, placed of record in 1857, as the block is delineated on a subsequent official map of that part of the city; on which map the block embraces the area now marked lots 47, 48, 49 and 50. If the area which forms these four lots was not a part of block 65 on the official map, recorded in 1857, the area certainly became a part of block 65 by virtue of the official map of that part of the city, made by Gooch, town surveyor of Shreveport, in May, 1852. On that map, the area which is now marked lots 47, 48, 49 and 50 was included as a part of block 65, and the block was shaped and located exactly as it appears on a later survey, made by Wm. R. Devoe, city surveyor, except that, on the Gooch survey, only one line was drawn across the block, at the center of its boundary on Commerce street and perpendicular thereto; whereas, on the Devoe map made in 1871, three additional lines appear, dividing the small triangle into the four lots, numbered 47, 48, 49 and 50. It is said in the brief for the widow and heirs of Jacobs that the Gooch map was not identified as an official map, and that there is no evidence that it is correct or that it was founded upon an actual survey. The map bears the legend that it was made by Gooch, surveyor of the town of Shreveport; and, by reference to the report of the decision in City of Shreveport v. Walpole, 22 La. Ann. 526 (decided in July, 1870), we find that the city based its suit upon the Gooch survey, which was made under authority of the municipality. We quote from the decision: "The plaintiff [City of Shreveport] designates the portion of the 'open space' alleged to be in the illegal possession of the defendant, as block No. 70, according to Gooch's survey and map of the open space, and which, they aver, lies between Commerce street and the river." The court said that the original map of Shreveport showed that the so-called "open space," lying between Commerce street and the river, was not subdivided into squares and lots, as the other part of the town was; and the court added: "A map or plat subsequently made from a survey of the 'open space' by Gooch, in 1852, is in evidence, and this plan shows that the block No. 70, the ground in controversy, is within the open space." Further interesting information on the subject of the establishment and laying off of the town of Shreveport, by the Shreveport Company, composed of Angus McNeil and six associates, may be found by reference to the case of Paulina Pickett et al. v. William Brown et al., 18 La. Ann. 560, and the case of Angus McNeil et al. v. Hicks & Howell, 34 La. Ann. 1090.

Gooch's method of surveying and making a map of the so-called "open space," or batture, between Commerce street and the river, was to divide it into blocks, numbered 67 to 71, inclusive, and to subdivide each block into lots. He did not subdivide into lots that part of block 65 which is now in dispute, but treated it as a part of block 65, which had never been divided into lots. Gooch was authorized by the city to survey the so-called "open space," which belonged to the city, as public property, and which the city was authorized by an act of the Legislature to dispose of for private purposes. The reason why Gooch did not resurvey or divide into lots any part of block 65 was that it was private property. Angus McNeil, as president of the Shreveport Company, had sold blocks 65 and 66 to Sturgis Sprague and John A. Sewell on the 6th of January, 1838; and, by Gooch's

survey, the city recognized the shape and extent of block 65, and as including the area which, in 1871, was marked lots 47, 48, 49 and 50.

The fact that the Gooch survey and map were made under authority of a resolution of the board of trustees of the town of Shreveport is evidence by a contract of lease (a copy of which is in the record), by which the mayor of Shreveport, on the 28th of May, 1852, under authority of a resolution of the board of trustees of the town, leased to one Charles H. Moody, for the term of five years, two lots in the so-called open space, and described them thus: "Two certain lots of ground in that·part of the town of Shreveport situated, lying and being between Travis, Fannin and Bossier Streets and Red river, surveyed and laid off into lots by John S. Gooch, Town Surveyor, pursuant to a resolution of the Board of Trustees passed and adopted October 7th, 1851, and known and designated on the map or survey of said portion of ·said town, made by said John S. Gooch, Surveyor, on file and of record in the office of the recorder of the Parish of Caddo, as Lots Nos. Two and Three (2 & 3) in Block or Square No. Seventy-one, as laid down and designated on said map."

In the deeds ·by which John R. Jones acquired the lots in contest they are described as ·being in block 65. For example, on the 27th of January, 1873, after the Devoe map, on which the plaintiffs depend, was recorded, Fernando Vasques, intending to sell lot 48 in block 65 ·to John R. Jones and William Robson, described the lot as "Lot No. Forty-seven in ˙ Block Sixty-five, in the property known as the Batture property, with all the buildings and improvements thereon situated," in the City of Shreveport, said parish." On the 28th of June, 1873, William Robson sold his half interest in the lot to Jones, and de-

scribed it as: "The undivided half interest in Lot No. Forty-eight (48) in Block Sixty-five (65), known as the Batture property in the City of Shreveport, in said parish." On the 22d of April, 1878, Jones sold to Robson "an undivided one-half interest in and to Lot Forty-seven (47) in Block Sixty-five (65), including one-half of all the improvements thereon." On the 23d of December, 1878, Jones bought Robson's half interest in the property of the firm of John R. Jones & Co., including the "Caddo Sawmill," etc., and thereby dissolved the partnership, and, in the act of sale, blocks 65 and 66 were described as lots 47, 48, 49, 50, 51, 52, 53, 54, 55 and 56 in block 65, and all of block 66. It may be that Jones and Robson had divided the upper portion of block 65 into lots, numbered 51 to 56, inclusive, for there is no lot numbered higher than 53 on any of the official maps. The important fact, however, is that Jones recognized that lots 47, 48, 49 and 50 were in block 65. On the 24th of May, 1888, Fernando Vasques gave Jones a deed correcting the error which had been made in the deed dated the 27th of July, 1873, by which he had intended to sell lot 48 but described it as lot 47 in block 65, and in the correction deed he sold to Jones "all interest which he might apparently have in and to said lot Forty-eight (48) in Block Sixty-five (65) of the Batture of the City of Shreveport."

Of all of the old deeds and documents in the record, the only one in which lots 47, 48, 49 and 50 were dealt with as if they were not a part of block 65 is an act of mortgage dated the 6th of May, 1887, by Jones to Jacobs, to secure a note for $2,000, payable in 60 days; in which act, a part of the property mortgaged is described as blocks 65 and 66, also lots 47, 48, 49 and 50 of the city batture. It may be that the parties had before them the Devoe

map, of 1871, and either believed that lots 47, 48, 49 and 50 were not a part of the area marked block 65, or else they described these lots additionally to make assurance doubly sure. On the Devoe map the figures 65 are in the center of that part of the block which does not include the four lots; but the explanation is simple. On the blueprint of the so-called tracing of the original official map, recorded in 1857, the triangle which is now composed of the four lots was left off; and the figures 65 appear on what was left of square 65. But, on the mutilated original map itself, recorded in 1857, there is nothing left of the figures 65 except the figure 5, which is so located in what is left of square 65 that it is apparent that the figure 6 was on the area now in dispute. Be that as it may, the fact that, in the act of mortgage by Jones to Jacobs, in 1887, lots 47, 48, 49 and 50 were regarded as being not a part of block 65 is not important, in view of the fact that in the deeds by which Jones acquired these lots they were regarded as being a part of block 65.

Our conclusion is that lots 47, 48, 49 and 50 are a part of block 65, and as such passed to the defendant under the mortgage and deeds conveying block 65. If this area, now in dispute, was not a part of block 65 on the official map recorded in 1857, as to which there is some doubt, this disputed area was added to block 65 by the official survey made by Gooch in 1852; and the survey made by Devoe, in 1871, by which he made no other change in block 65 than to divide the added area into four lots, did not detach them from block 65.

The judgment in favor of the heirs of W. B. Jacobs is annulled, and the demands of the plaintiffs are rejected and their suit is dismissed at their cost.